**AKERMAN LLP**
ELLEN S. ROBBINS (SBN 298044)
E-mail: ellen.robbins@akerman.com
ALICIA Y. HOU (SBN 254157)
E-mail: alicia.hou@akerman.com
JONATHAN M. TURNER (SBN 320614)
Email: jonathan.turner@akerman.com
601 W. Fifth Street, Suite 300
Los Angeles, CA 90071
Telephone: (213) 688-9500
Facsimile:  (213) 627-6342

**P.C.WOO & ZHONGLUN W.D. LLP**
JIE LIAN (SBN 273146)
19th Floor, Times Financial Center
4001 Shennan Avenue
Futian District, Shenzhen, PR China 518048
Telephone:  (+86) 1360 115 9239
Facsimile:  (+86 755) 8831 9191
E-Mail: lianjie@zlwd.com

Attorneys for Plaintiff
800 COLUMBIA PROJECT COMPANY, LLC

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| 800 COLUMBIA PROJECT COMPANY, LLC, a Washington limited liability company;<br><br>    Plaintiff,<br><br>  v.<br><br>CMB WING LUNG BANK, LTD., a Hong Kong bank doing business in California; and DOES 1 to 100, inclusive;<br><br>    Defendant. | Case No. 8:21-cv-00278-JLS-ADS [Assigned to the Hon. Josephine L. Staton]<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANT CMB WING LUNG BANK LTD.'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Judge: Hon. Josephine L. Staton<br>Hearing Date: September 16, 2022<br>Hearing Time: 10:30 a.m.<br>Courtroom: 8A |

**AKERMAN LLP**
601 W. FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

# **TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ................................................................................. 1

II.     RELEVANT FACTUAL BACKGROUND ........................................ 1

    A.      The Parties ................................................................................ 1

    B.      The Construction Loan, Checking Account, and Security Procedures ................................................................................. 2

    C.      The Wire Transfer Process ....................................................... 3

    D.      The Bank Unilaterally and Arbitrarily Suggests Printed Templates .... 4

    E.      Fraudulent Activity and the Three Fraudulent Wires ............ 4

        1.      The Bank Processes First Fraudulent Wire Transfer ................. 5

        2.      The Bank Processes Second Fraudulent Wire Transfer ........... 6

        3.      The Bank Processes Third Fraudulent Wire Transfer ............... 8

        4.      The Bank's Operational Failures For The Wire Transfers ........ 8

    F.      The General Authorization and Indemnification Agreement ............. 8

III.    LEGAL STANDARD ......................................................................... 9

IV.     LEGAL ARGUMENT ....................................................................... 9

    A.      The Remittance Applications Were Not Authorized. .......................... 9

        1.      The Fraudulent Order Did Not Originate from 800 Columbia. ............................................................................... 9

        2.      The GAIA Is Unenforceable Under CCC § 11202(f). ............. 10

        3.      The GAIA Is An Unenforceable Adhesion Contract. .............. 11

    B.      The Bank's Security Procedures Were Not Commercially Reasonable or Complied With in Good Faith. ........................... 11

        1.      Plaintiff Disputes the Bank's Asserted Security Procedures .... 12

        2.      The Security Procedures Were Not Commercially Reasonable. ........................................................................ 13

        3.      The Security Procedures Were Not Followed in Good Faith ... 17

    C.      Plaintiff's Common Law Claims are Actionable. ............................. 21

        1.      The CCC Does Not Preempt Common Law Causes of Action. .................................................................................. 21

            a.      Plaintiff's Fraud Causes of Action are Not Preempted.. 21

            b.      Plaintiff's Negligence Claim is Not Displaced. ............. 22

    D.      Plaintiff's Damages Should Not Be Reduced. ................................... 24

    E.      The Bank Is Not Entitled to Summary Judgment on Mitigation. ....... 24

V.      CONCLUSION ............................................................................... 25

AKERMAN LLP

601 W. FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Across Am. Ins. Servs., Inc. v. Bank of Am., N.A.*,
  No. SACV180874 DOCPLAX, 2018 WL 5906674 (C.D. Cal. Sept. 24, 2018)
  ...................................................................................................................21, 22

*All Am. Siding & Windows, Inc. v. Bank of Am., Nat'l Ass'n*,
  367 S.W.3d 490 (Tex. App. 2012) ............................................................. 16, 17

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)............................................................................................ 9

*Armendariz v. Found. Health Psychcare Servs., Inc.*,
  24 Cal. 4th 83 (Cal. 2000) ............................................................................... 11

*Barrett v. JP Morgan Chase Bank*,
  No. 14-CV-2976-DMS WVG, 2015 WL 631652 (S.D. Cal. Feb. 13, 2015).....21

*Cal. Surgical Inst., Inc. v. Aetna Life & Cas. Berm. Ltd.*,
  2020 U.S. Dist. LEXIS 245755 (C.D. Cal. Oct. 20, 2020) ...............................22

*Chelan Cnty., Wash. v. Bank of Am. Corp.*,
  No. 2:14-CV-0044-TOR, 2015 WL 4129937 (E.D. Wash. July 9, 2015) ...13, 19

*Choice Escrow & Land Title, LLC v. BancorpSouth Bank*,
  754 F.3d 611 (8th Cir. 2014) ...................................................................... 11, 16

*Experi-Metal, Inc. v. Comerica Bank*,
  Case No. 09-14890, 2011 WL 2433383 (E.D. Mich. June 13, 2011)...............17

*Fed. Ins. Co. v. Benchmark Bank*,
  2020 U.S. Dist. LEXIS 23315 (S.D. Ohio Feb. 11, 2020) .......................... 16, 17

*Filho v. Interaudi Bank*,
  No. 03 Civ. 4795(SAS), 2008 WL 1752693, - 5 (S.D.N.Y. Apr. 16, 2008)......17

*Filho v. Interaudi Bank v. Regatos v. N. Fork Bank*,
  257 F. Supp. 2d 632 (S.D.N.Y. 2003) ............................................................. 17

*Grabowski v. Bank of Boston*,
  997 F. Supp. 111 (D. Mass. 1997).................................................................... 10

AKERMAN LLP

601 W. FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

*Helfend v. S. Cal. Rapid Transit Dist.*,
    465 P.2d 61 (Cal. 1970)............................................................................24

*Home Indem. Co. v. Lane Powell Moss & Miller*,
    43 F.3d 1322 (9th Cir. 1995) ...................................................................24

*In re Nelson*,
    No. 04-70024-FRA7, 2007 WL 2915407 (Bankr. D. Or. Sept. 28, 2007).........20

*Joffe v. United Cal. Bank*,
    141 Cal. App. 3d 541 (1983) ...................................................................23

*Lundgren v. Bank of Am., N.A.*,
    2011 U.S. Dist. LEXIS 114334 (N.D. Cal. Oct. 4, 2011) .................................23

*McClellon v. Bank of Am., N.A.*,
    2018 U.S. Dist. LEXIS 172700 (W.D. Wash. Oct. 5, 2018)...........................23

*Mechanics Bank v. Methven*,
    No. A136403, 2014 WL 4479741 (Cal. Ct. App. Sept. 12, 2014).........19, 20, 21

*O'Connor v. Boeing N. Am., Inc.*,
    311 F.3d 1139 (9th Cir. 2002) ...................................................................9

*Patco Const. Co., Inc. v. People's United Bank*,
    684 F.3d 197 (1st Cir. 2012).......................................................13, 14, 15

*Peak–Las Positas Partners v. Bollag*
    172 Cal. App. 4th 101 (Cal. Ct. App. 2009)...............................................21

*Prime Health Servs., Inc. v. Cap. Bank, N.A.*,
    No. 3:16-CV-00034, 2017 WL 1064360 (M.D. Tenn. Mar. 21, 2017) .............23

*ReAmerica, S.A. v. Wells Fargo Bank Int'l*,
    2008 U.S. Dist. LEXIS 30614 (S.D.N.Y. Mar. 18, 2008)..............................23

*Robinson Helicopter Co. v. Dana Corp.*,
    102 P.3d 268 (Cal. 2004)..........................................................................24

*Royal Thrift and Loan Co. v. County Escrow*,
    Inc., 20 Cal. Rptr. 3d 37, 47 (Cal. Ct. App. 2004) ...............................25

*S&S Worldwide, Inc. v. Wells Fargo Bank*,
    509 F. Supp. 3d 1154 (N.D. Cal. 2020)...................................................22

AKERMAN LLP
601 W. FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

**PLAINTIFF'S OPPOSITION TO DEFENDANT CMB WING LUNG BANK LTD.'S
NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**

66037720;1

*Sheen v. Wells Fargo Bank, N.A.*,
  505 P.3d 625 (Cal. 2022)*, reh'g denied* (June 1, 2022) .....................................24

*Smock v. State of California*,
  138 Cal. App. 4th 883 (Cal. Ct. App. 2006)......................................................24

*Valley Bank of Ronan v. Hughes*,
  147 P.3d 185 (Mont. 2006)...............................................................................22

*Venture Gen. Agency, LLC v. Wells Fargo Bank N.A.*,
  19-cv-02778-TSH, 2019 WL 3503109 (N.D. Cal. Aug. 1, 2019) ....................21

*Zengen, Inc. v. Comerica Bank*,
  41 Cal. 4th 239 (Cal. 2007) ..............................................................................21

**Statutes**

Bank Secrecy Act....................................................................................................20

Cal. Com. Code, §§ 11202, 11203................................................................10, 16

Cal. Com. Code §11202(a) ...................................................................................9, 10

Cal. Com. Code § 11202(b) ...........................................................................11, 12, 17

Cal. Com. Code § 11202(c) ......................................................................................13

Cal. Com. Code § 11202(f) ......................................................................................10

Cal. Com. Code §11203, Cmt. 3..............................................................................25

U.S. Patriot Act ................................................................................................12, 20

UCC §§ 4A-105(d) ...................................................................................................17

UCC §§ 4A-202 and 4A-203 ...................................................................................10

**Rules**

Fed. R. Civ. P. 56(a) .................................................................................................9

**Other Authorities**

Federal Financial Institutions Examination Council, "Authentication and Access
  to Financial Services and Systems", Section 5
  .................................................................................................................15

AKERMAN LLP
601 W. FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

AKERMAN LLP

601 W. FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

## I.   INTRODUCTION

This case is about whether Defendant CMB Wing Lung Bank should be liable for releasing millions of dollars of Plaintiff 800 Columbia Project Company, LLC's funds, in violation of the Bank's own internal control policies, to unknown, offshore beneficiaries in the face of blatant red flags that should have triggered any reasonable person to suspect fraud, while failing to implement in good faith commercially reasonable security procedures.  Particularly, the Bank transferred millions of dollars of Plaintiff's domestic construction and insurance premium payments to accounts of two trading companies in Hong Kong—a high-risk region for financial crimes—in complete disregard of myriad red flags such as fake email addresses, fake signatures and nonsensical last-minute requests to change beneficiaries.

Under governing law, a financial institution has the obligation to implement commercially reasonable security procedures and comply with those procedures in good faith.  Here, the Bank failed to do both, which failure was preceded by the Bank's fraudulent and negligent pre-transfer conduct, including misrepresenting its security procedures and failing to properly train its employees to identify fraud. The Bank's motion for summary judgment should be denied because material facts are disputed; indeed the parties cannot even agree which security procedures were at play.

## II.   RELEVANT FACTUAL BACKGROUND

### A.   The Parties

Plaintiff 800 Columbia Project LLC (**Plaintiff** or **Company**) is a single purpose entity created to develop a condominium tower in Seattle.  (Defendant's Statement of Uncontroverted Facts (**DSUF**) 1.)  The Company is a joint venture between 800 Columbia Investor, LLC and Greentown Property (US), Inc.  Seattle-based Daniels Real Estate is the manager of the Company. (Plaintiff's Statement of Additional

**PLAINTIFF'S OPPOSITION TO DEFENDANT CMB WING LUNG BANK LTD.'S**
**NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**

AKERMAN LLP

601 W. FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

Uncontroverted Facts (**PSUF**)[1] 54.)   Defendant CMB Wing Lung Bank, LTD (**Defendant** or **Bank**) is based in Hong Kong with two U.S. branches, including the Newport Beach branch at issue.  (PSUF 55.)  The Bank is a full federal branch which must comply with all relevant federal laws and regulations."  (PSUF 56.)   The Construction Loan, Checking Account, and Security Procedures

In July 2019, the Company sought a $150 million construction loan from Defendant, and while applying, opened a checking account on or about July 26, 2019 for Plaintiff's operating expenses.   (DSUF 2, PSUF 57.)   At all relevant times, Company employees interfaced with Defendant's customer banking representative Shasha Tong for all banking needs.  (PSUF 58.)  Plaintiff advised it would need to use Defendant's wire transfer service to pay certain expenses related to the development.  (PSUF 59.)   Defendant represented that it had implemented certain security procedures, inducing Plaintiff to bank with Defendant:

(1)    Representations included in the Account Disclosure, transmitted by Ms. Tong to Plaintiff on July 26, 2019, stating Defendant followed the standards set forth in applicable anti-money laundering laws and federal and state regulations.

(2)    An August 21, 2019 e-mail wherein Ms. Tong set forth the Bank's security procedures for making wire transfers outside the U.S., stating that the Bank "will need supporting document to explain the relationship between [Plaintiff] and this China entity, as well as what service it provides to the project, according to bank's KYC (Know-Your-Customer) and compliance requirements."  (PSUF 60.)

These were the only agreed upon security procedures.  Plaintiff disputes the Bank's contention that agreed upon procedures included a confirmation email or "callback," as such practices were not followed consistently (in the case of e-mail confirmations), or not followed at all (in the case of "callbacks").  (PSUF 61.)

---

[1] Per Hon. Staton's Initial Standing Order (rev. 10/1/2018), "additional facts shall continue in *sequentially numbered* paragraphs…."  (Emphasis added.)  Accordingly, Plaintiff has commenced it's fact numbering at "54."

**B.    The Wire Transfer Process**

Between October 2019[2] and December 2019, when Plaintiff wanted to send a wire, one of Plaintiff's finance managers, Dong Liang a/k/a Kay Liang, would print out a blank remittance application, fill in payment information in handwriting, sign the completed remittance form, and then e-mail a scanned copy of her signed application to Plaintiff's other finance manager, Robert Beeson for countersigning, always including Ms. Tong on the CC line.  (PSUF 63.)  Upon receipt of Ms. Liang's signed remittance form, Mr. Beeson would print out and countersign the scanned remittance form, and e-mail the completed form to Ms. Tong for processing. (PSUF 64.)  Between the account opening and January 2020 (when the subject fraudulent wire payment orders took place), Defendant processed 13 wire remittance applications, all of which were to **domestic** vendors, with several to the same beneficiaries, pursuant to the process outlined above and without incident as follows:

| DATE | AMOUNT | BENEFICIARY | BENEFICIARY LOCATION |
|------|--------|-------------|----------------------|
| 1/7/20 | $3,191.02 | Plaintiff's landlord Healthcare Property Investors, Inc. | Seattle |
| 12/20/19 | $3,303,724.78 | Plaintiff's general contractor, Turner Construction | Seattle |
| 12/16/19 | $107,590.93 | Plaintiff's insurance carrier First Insurance Funding Corp. | Chicago |
| 12/05/19 | $3,191.02 | Healthcare Property Investors, Inc. | Seattle |
| 11/25/19 | $2,471,001.79 | Turner Construction | Seattle |
| 11/19/19 | $3,191.02 | Healthcare Property Investors, Inc. | Seattle |
| 11/15/19 | $26,997.50 | Plaintiff's marketing company Studio 216 DBA Altoura | Seattle |
| 11/1/19 | $10,000 | Plaintiff's designer Creative License International, LLC | Seattle |
| 10/8/19 | $75,000 | Plaintiff's marketing manager Red Propeller, Inc. | Seattle |
| 10/28/19 | $1,408,658.17 | Turner Construction | Seattle |

---

[2] Prior to October 2019, Plaintiff had one employee sign the remittance applications. The "dual-signing" process was later implemented for the purpose of ensuring that each partner in the joint venture independently approved of each payment. (PSUF 62)

**PLAINTIFF'S OPPOSITION TO DEFENDANT CMB WING LUNG BANK LTD.'S**
**NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**

66037720;1

AKERMAN LLP
601 W. FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

| 10/30/19 | $17,833.67 | Health Care Property Investors, Inc | Seattle |
| 9/26/19 | $2,066,477.09 | Turner Construction | Seattle |
| 8/28/19 | $2,471,537.91 | Turner Construction | Seattle |

(PSUF 65.)  Due to its processing of these wires, Defendant was aware or otherwise should have been familiar with the fact that Plaintiff's payees were always located in the U.S.  (PSUF 66.)  Defendant claims there existed a "callback procedure" where it would call Plaintiff to confirm any wire over $1 million dollars, but Plaintiff did not receive a "callback" for *any* of the above wires exceeding $1 million.  (PSUF 67.)

### C.    The Bank Unilaterally and Arbitrarily Suggests Printed Templates

On or about December 21, 2019, after observing that Plaintiff was making repetitive payments to its Seattle-based general contractor Turner Construction, Ms. Tong e-mailed Plaintiff's representatives noting that Plaintiff's remittance applications to Turner Construction were always handwritten, and provided Plaintiff with pre-filled remittance applications with the beneficiary information typed out, suggesting that Plaintiff use the pre-filled applications instead.  (PSUF 68.)

### D.    Fraudulent Activity and the Three Fraudulent Wires

At some point thereafter, an unknown scammer hacked Mr. Beeson's work email account, and in January 2020, impersonated Mr. Beeson and sent fake e-mails masquerading as other Company employees, in a common business e-mail compromise known as phishing. (PSUF 69.)  The hacker purposely set malicious rules on Mr. Beeson's email account, preventing him from seeing both incoming and outgoing e-mails from certain email addresses.  (PSUF 70.)  The scammer copied and pasted Mr. Beeson's signature on prior valid *handwritten* remittance applications onto the three subsequent bogus *typewritten* remittance applications.  (PSUF 71.)  In January 2020, three unauthorized wire transfers totaling $5,697,724.42 were made from Plaintiff's Account to Hong Kong bank accounts held by two foreign trade companies wholly unknown and unrelated to Plaintiff.  (PSUF 74-105.)  Notably, the

AKERMAN LLP

601 W. FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

fraudulent payment orders did not originate from a computer under the direct control of Plaintiff; they originated from an unknown source. (PSUF 73.)

### 1. The Bank Processes First Fraudulent Wire Transfer

On January 14, 2020, Ms. Liang prepared and signed a valid remittance application in the amount of $107,590.93 payable to Plaintiff's Illinois-based insurance carrier. (PSUF 74.) She printed out a blank application form, handwrote the requested information, and signed the original copy. (PSUF 75.) Ms. Liang then e-mailed a scanned copy of the signed *handwritten* application to Mr. Beeson for countersigning, copying Ms. Tong, on the e-mail. (*Id*.) Mr. Beeson printed out the handwritten remittance application signed by Ms. Liang, counter-signed, scanned and emailed it to the Bank (via Ms. Tong) for processing. (PSUF 76.)

On January 15, 2020, after Mr. Beeson e-mailed the valid remittance application to Ms. Tong, the scammer, posing as Mr. Beeson, e-mailed Ms. Tong from the Beeson E-mail Account without Mr. Beeson's knowledge and instructed her not to wire the payment to the insurance carrier identified on the remittance form because the Company was experiencing "issues with the IRS." (PSUF 77.) Instead, the scammer instructed Ms. Tong to make the payment to a Hong Kong account held by Chengfang Trade Limited - a third party with no business relationship with Plaintiff, and from its name, should have raised concerns that it was not an insurance company. (PSUF 78.) Ignoring these red flags, Ms. Tong responded to the scammer's email:

> *Well understood Bob. I'll cancel the scheduled wire now. To initialize the new wire to the new beneficiary in your email below, could you please kindly send me another remittance application form with the new beneficiary information and signed by you and Kay/Jessie? If it's not easy to contact Kay today, you can try to have Jessie sign the form tonight. We'll process the wire tomorrow as long as we can receive the signed new remittance application form by early tomorrow morning.*

AKERMAN LLP
601 W. FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

**PLAINTIFF'S OPPOSITION TO DEFENDANT CMB WING LUNG BANK LTD.'S
NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**

66037720;1

(PSUF 79.)   The scammer then sent to Ms. Tong via the Beeson E-mail Account a fake *typewritten* remittance application with the copied/pasted signatures of Ms. Liang and Mr. Beeson requesting the First Payment be sent to Chengfang Trade.  (PSUF 80.) Ms. Tong did not implement the security protocols outlined in her August 21, 2019 e-mail by asking for supporting documents demonstrating a business nexus with the foreign beneficiary, nor did she follow the Bank's policies and procedures related to fraud detection.  (PSUF 81.)  Instead, the Bank processed the wire transfer – failing to investigate the suspicious change in beneficiary and ignoring the following red flags: (1) a customer (with a pending loan application) experiencing "IRS issues," (2) a change from a routine domestic beneficiary to an unknown offshore beneficiary; (3) a cut and paste signature from a prior remittance application; (4) a typewritten, rather than handwritten application (as was Plaintiff's customary procedure); and (5) fake e-mail domains.  (PSUF 82.)  Plaintiff, meanwhile, reasonably assumed that the wire went to the intended beneficiary, the insurance carrier. (PSUF 83.)

### 2.   The Bank Processes Second Fraudulent Wire Transfer

On Friday, January 17, 2020, Ms. Liang e-mailed Mr. Beeson and Ms. Tong a handwritten remittance form for payment to its same Seattle-based general contractor in the amount of $5,090,133.49, to be paid Monday, January 20.  (PSUF 84.)  Two hours later, using a fake e-mail address, the scammer pretended to be Ms. Liang and sent an e-mail to Ms. Tong again requesting that the payee be changed – this time because Turner Construction was experiencing "IRS issues."  (PSUF 85.) This fake remittance form changed the beneficiary to a Hong Kong account in the name of Guoy Trade, a third-party with no business relationship with Plaintiff, and obviously not a contractor. (PSUF 86.)  The second fake application also contained copy and pasted signatures (indeed – identical signatures) from a prior application, was typed rather than handwritten, and contained fake emails for Plaintiff's employees.  (PSUF 87.)

**PLAINTIFF'S OPPOSITION TO DEFENDANT CMB WING LUNG BANK LTD.'S**
**NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**

66037720;1

AKERMAN LLP

601 W. FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

Prior to processing the wire, Ms. Tong made a call to Mr. Beeson that lasted one minute and nine seconds. (PSUF 88.) The parties dispute what was discussed on the call; there is no audio recording. (PSUF 89.) Ms. Tong claims she called Mr. Beeson in compliance with a purported "callback procedure" for wires over $1 million, and to confirm the purported change in beneficiary. (PSUF 90.) Ms. Tong's version of events is supported only by a questionable "call script" purporting to quote verbatim what she and Mr. Beeson stated during the telephone call, which she created at the bank manager Jian Ma's direction over two weeks *after* the call took place and *after* the fraud was discovered. (PSUF 91, 92.) While the Bank claims this call was made pursuant to a purported agreed-upon "callback procedure", the evidence shows that *the Bank never conducted a "callback" for the five previous wires in excess of $1 million* – raising further questions about Ms. Tong's story. (PSUF 93.) Additionally, as testified by *the Bank's* expert, Ms. Tong's call script does not meet the requirements of what constitutes a "callback" under industry standards. (PSUF 94.)

Mr. Beeson testified that Ms. Tong called him only to advise that the wire would go out the following Tuesday, rather than Monday, given the Martin Luther King, Jr. holiday. (PSUF 95.) Further, Mr. Beeson believed Ms. Tong was inquiring about payment to Turner Construction, as Ms. Tong never verified the identity of the payee during the call or prior to processing the payment pursuant to the falsified instructions. (PSUF 96.) Following this call, the scammer e-mailed Ms. Tong advising that it would be okay for the wire to go out on Tuesday (which should have raised suspicion given that Ms. Tong had just spoken to the real Mr. Beeson about this). (PSUF 97.) Then that same afternoon, the scammer e-mailed Ms. Tong and asked whether the wire could go out that day, instead of Tuesday (this, too, should have raised suspicion given that the real Mr. Beeson confirmed that Tuesday was not a problem.) (PSUF 98.) The following Tuesday, the scammer *again* e-mailed Ms. Tong asking about the wire's status. (PSUF 99.) These emails constitute an "urgent

plea" and should have triggered Ms. Tong to further investigate. (PSUF 100.) Instead, the Bank ignored the red flags and proceeded with processing the second wire transfer. (PSUF 101.) Significantly, Ms. Tong <u>again</u> did not implement the security protocols in her email by asking for supporting documents demonstrating a business nexus with yet another new, foreign beneficiary. (PSUF 102.)

### 3. The Bank Processes Third Fraudulent Wire Transfer

On January 28, 2020, the scammer, using the fake email account, initiated another remittance application for $500,000 allegedly for Turner Construction – and again changed the beneficiary to Guoy Trade. (PSUF 103.) The fake application contained signatures clearly copied and pasted by the scammer from prior application forms. (PSUF 104.) Again, Ms. Tong did not ask for supporting documents to show a legitimate business purpose for payment to an offshore beneficiary, and processed the payment notwithstanding the clear red flags. (PSUF 105.)

### 4. The Bank's Operational Failures For The Wire Transfers

The failure to detect and investigate the red flags did not end at Ms. Tong. Once Ms. Tong directed the Operations Department to fund the wires, three people at the Bank – Chloe Wang, Jane Zhang, and Krystal Yan – would each review the remittance application, culminating with a final review by the bank manager Jian Ma or deputy bank manager Richard Zhang. (PSUF 106.) Ms. Wang and Ms. Zhang did not have significant banking experience, and neither had ongoing training on detecting fraudulent wires or business e-mail compromises. (PSUF 107.) Indeed, shockingly, Ms. Wang, Ms. Zhang and Mr. Ma each testified they did not feel it was part of their duties to monitor applications for fraud or red flags. (PSUF 108, 109.)

### E. The General Authorization and Indemnification Agreement

When Plaintiff first sought to open the checking account, Defendant requested Plaintiff submit underlying business documents including the Company's Operating Agreement (the "OA"), which disclosed whom within the Company had authority to

**PLAINTIFF'S OPPOSITION TO DEFENDANT CMB WING LUNG BANK LTD.'S**
**NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**

66037720;1

AKERMAN LLP
601 W. FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

make payments or legally bind the Company.  (PSUF 110.)  Defendant also presented account opening documents to Plaintiff to sign.  Buried in the stack of these opening documents was a General Authorization and Indemnification Agreement (GAIA). (PSUF 111.)   At various times, Defendant led Plaintiff's employees to sign the account opening documents, including the GAIA, under the guise that the documents were simply form documents needed for signature verification card purposes.  (PSUF 112.)   Not only were the employees who signed the GAIA unaware of the legal significance of what they were signing, but also none of them had authority to legally bind Plaintiff to an indemnification agreement.  (PSUF 113.)

## III.   LEGAL STANDARD

Summary judgment should only be granted where the movant can demonstrate that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is genuine if a reasonable trier of fact could draw an inference that would allow it to resolve the dispute in favor of the nonmoving party. *Id*. In evaluating a motion for summary judgment, this Court must "draw all reasonable inferences from the evidence" in favor of Plaintiff, the nonmoving party.  *O'Connor v. Boeing N. Am., Inc.*, 311 F.3d 1139, 1150 (9th Cir. 2002) (emphasis added).  If "the evidence yields conflicting inferences, summary judgment is improper, and the action must proceed to trial." *Id*. at 1150.

## IV.   LEGAL ARGUMENT

### A.   The Remittance Applications Were Not Authorized.

#### 1.   The Fraudulent Order Did Not Originate from 800 Columbia.

The Bank incorrectly asserts that the GAIA deems the remittance application authorized under California Commercial Code ("CCC") §11202(a).  Indeed, the individual who provided the payment order to the Bank (the hacker) was not

AKERMAN LLP
601 W. FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

66037720;1

authorized to do so—either expressly or under agency law—and therefore, under the CCC, Plaintiff does not bear the loss that occurred from the transfer.   Defendant quotes the GAIA to argue the parties agreed that "any electronic mail originated from a … computer under the direct or indirect control of [800 Columbia] or to which [800 Columbia] has ever had any access whatsoever will be conclusively presumed to be an authorized communication from [800 Columbia]." (Motion at 8.)   But the payment order *did not* originate from a computer under the control of Plaintiff.   (PSUF 73.) The Bank does not have credible evidence showing otherwise.   Thus, the GAIA does not render the remittance application authorized under CCC § 11202(a).

### 2.     The GAIA Is Unenforceable Under CCC § 11202(f).

The Bank also has taken the shocking position that due to the GAIA, it had no obligations whatsoever with respect to the authenticity of the fraudulent wire transfers and the provision of any security measures to prevent such fraud.   The GAIA is unenforceable as written, as it contains an impermissible shift of liability and a unduly broad indemnity clause.   *See* CCC § 11202(f) (". . .rights and obligations arising under this section or Section 11203 may not be varied by agreement.").

The GAIA attempts to absolve the Bank from any responsibility to employ a commercially reasonable security procedure and for any liability whatsoever for unauthorized transfers, stating in Section 2 that Account Holder assumes all risks regarding the authenticity of any electronic communication purportedly made by the account holder, in Section 3 that the Account Holder agrees that the bank shall be under no obligation to utilize security procedures, and in Section 4 that the Bank will be indemnified from all liability arising from any electronic communication.   Courts have uniformly determined that similar waivers of liability and indemnity agreements are unenforceable under UCC §§ 4A-202 and 4A-203. *See Grabowski v. Bank of Boston*, 997 F. Supp. 111, 120 (D. Mass. 1997) (holding account agreement was "not an enforceable modification of the loss allocation scheme set forth in article 4A");

AKERMAN LLP
601 W. FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

**PLAINTIFF'S OPPOSITION TO DEFENDANT CMB WING LUNG BANK LTD.'S
NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**

66037720;1

*Choice Escrow & Land Title, LLC v. BancorpSouth Bank*, 754 F.3d 611, 625 (8th Cir. 2014) (indemnification provision requiring Choice to indemnify BancorpSouth for damages from fraudulent payment order unenforceable).

### 3.     The GAIA Is An Unenforceable Adhesion Contract.

The general rule that one who signs an instrument may not avoid the impact of its terms on the ground that he failed to read the instrument before signing it does not apply to a contract of adhesion. *See Armendariz v. Found. Health Psychcare Servs., Inc.*, 24 Cal. 4th 83, 113 (Cal. 2000). The Bank had inherently greater bargaining power and there was no opportunity to negotiate the terms of the GAIA. *Id* at 115. Moreover, the GAIA presents a clear violation of the reasonable expectations of Plaintiff in that it purported to waive significant legal rights under the guise of being part of broader signature verification materials.  Indeed, none of the employees who signed the GAIA had authority under the OA to legally bind the Plaintiff.  The OA, which the Bank had in its possession at all relevant times, expressly states "no Member, employee or other agent of the Company shall have any power or authority to bind the Company in any way, to pledge its credit or to render it liable for any purpose" and that the "granting of any guarantees or indemnities" were not within the authority of the employees who signed the GAIA.  (PSUF 113.)

### B.     The Bank's Security Procedures Were Not Commercially Reasonable or Complied With in Good Faith.

Section 11202(b) of the CCC states that if a bank and its customer have agreed that the authenticity of payment orders will be verified pursuant to a security procedure, a payment order received by the receiving bank is effective as the order of the customer, whether or not authorized, if:

> (i) the security procedure is a *commercially reasonable method of providing security* against unauthorized payment orders, *and*

AKERMAN LLP

600 W. FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

> (ii) the bank proves that it accepted the payment order in *good faith* and in compliance with the security procedure and any written agreement or instruction of the customer restricting acceptance of payment orders issued in the name of the customer.

Cal. Com. Code § 11202(b) (emphasis added).  The security procedures used by the Bank here were neither commercially reasonable nor complied with in good faith.

### 1.    Plaintiff Disputes the Bank's Asserted Security Procedures.

The only agreed upon security procedures at the time of the fraudulent transfers consisted of: (1) a dual signature requirement for wire transfers where both an authorized representative of Greentown Property (US), Inc. and an authorized representative of 800 Columbia Investor, LLC were required to approve wire transfers through the email submission of a remittance application to the Bank (which procedure was established by Plaintiff for the sole purpose of ensuring that representatives of both joint venture partners approved of all expenses); (2) the Bank's internal security policies adopted in 2019 and in effect January 2020 for Newport Beach branch, and its Account Disclosure stating Defendant was subject to and followed standards set forth in applicable anti-money laundering laws and federal and state regulations, including the U.S. Patriot Act; and (3) Ms. Tong's August 21, 2020 email stating that if the Company wished to "pay entity outside of US, [the Bank] will need supporting documents to explain the relationship between the project company and this China entity, as well as what service it provides to the project, according to bank's KYC (Know-Your-Customer) and compliance requirement."  (PSUF 60, 62.)

The Bank, on the other hand, asserts that the agreed upon security procedures consisted of: (1) dual signatures on 800 Columbia's payment orders with a signature comparison to the respective signer; (2) same-day e-mail confirmation to all four signers for any wire equal to or above $100,000; and a (3) phone call confirmation for any transfers equal to or above $1,000,000.  (Motion at 18-19.)  Significantly, Plaintiff

**PLAINTIFF'S OPPOSITION TO DEFENDANT CMB WING LUNG BANK LTD.'S
NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**

66037720;1

AKERMAN LLP

601 W. FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

disputes that the agreed upon security procedure included a confirmation email or phone call confirmations. (PSUF 61.)  Thus, there is a genuine issue of material fact as to the security procedures – making summary judgment inappropriate. *See Chelan Cnty., Wash. v. Bank of Am. Corp.,* No. 2:14-CV-0044-TOR, 2015 WL 4129937, at *16 (E.D. Wash. July 9, 2015)(citing *TransWorld Airlines, Inc. v. Am. Coupon Exch., Inc.,* 913 F.2d 676, 684–85 (9th Cir. 1990)) (denying summary judgment where there was a dispute as to the security procedures).

### 2.    The Security Procedures Were Not Commercially Reasonable.

Under Section 11202(c) of the CCC, the issue of whether a particular security procedure is "commercially reasonable" is a question of law to be determined "by considering the wishes of the customer expressed to the bank, the circumstances of the customer known to the bank, including the size, type, and frequency of payment orders normally issued by the customer to the bank, alternative security procedures offered to the customer, and security procedures in general use by customers and receiving banks similarly situated." Cal. Com. Code § 11202(c).  Significantly, neither version of agreed security procedures is commercially reasonable under the CCC.

In evaluating the commercial reasonableness of the Bank's security procedure, the court's decision in *Patco Const. Co., Inc. v. People's United Bank*, 684 F.3d 197 (1st Cir. 2012)—a case (improperly) cited by Defendant's expert David Kreig—is informative. In *Patco*, the security measures of the defendant bank were deemed to be "not commercially reasonable" where the bank neither monitored transactions nor provided notice to customers before allowing transactions to be completed when it had warning that fraud likely was occurring. *Id.* at 212-213.  In *Patco*, the fraudulent withdrawals at issue were "entirely uncharacteristic" of the customer's ordinary payment because they were directed to new payees and originated from computers not recognized by the bank. *Id.* at 213. The court found the bank failed to use security measures "not uncommon" in the industry, including manual reviews of high risk

13

**PLAINTIFF'S OPPOSITION TO DEFENDANT CMB WING LUNG BANK LTD.'S
NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**

66037720;1

transactions and the use of password-generating security tokens. *Id.*

Here, the Bank was aware that Plaintiff was a joint venture formed for a Seattle construction project. (DSUF 1, PSUF 54.) There was one Bank representative designated to interact with 800 Columbia in approving and transmitting wires to its vendors. (PSUF 58.) The Bank was familiar with regular payments made by Plaintiff to its insurance providers, general contractor and other vendors—all of which were made on a regular basis to domestic entities. (PSUF 66.) In fact, the Bank's internal operations clerk, Chloe Wang, noticed that Plaintiff was making regular payments to Turner Construction, and suggested Plaintiff use a pre-typed form including Turner's address and domestic bank. (*Id.*) Significantly, prior to the fraudulent payments, Plaintiff had only transmitted wires to domestic entities. (PSUF 65.)

The Bank did not implement security measures common in the industry, which would have almost certainly prevented the fraudulent wires. Like the fraudulent wires in *Patco*, the payment orders at issue were entirely uncharacteristic of Plaintiff's ordinary transactions: they originated from computers and IP addresses Plaintiff had never used and they were directed to two entirely new payees in Hong Kong—a foreign region designated as "high risk." More specifically, the remittance applications for these regular payments consistently made to the insurance company and general contractor, were abruptly halted by the hacker's email instructions to make the payments to new payees, two Chinese trading companies. Not only were these regular and consistent payments directed to accounts that Plaintiff had never directed funds, but also the new remittance applications were typed rather than handwritten and utilized copy and pasted signatures on them as opposed to wet signatures. Further alarming is that the hacker represented that an "IRS Problem" was the reasoning behind the urgent and abrupt change in payees.

The Bank had no security measures in place to detect that the source of the remittance application was a different IP address and email address. (PSUF 114.)

AKERMAN LLP

601 W. FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

**PLAINTIFF'S OPPOSITION TO DEFENDANT CMB WING LUNG BANK LTD.'S
NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**

66037720;1

AKERMAN LLP

601 W. FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX (213) 627-6342

The Bank did not use multifactor authentication, e.g., out-of-band authentication or tokens, such as those recommended by the Federal Financial Institutions Examination Council ("FFIEC") guidance and as emphasized by courts in evaluating whether security procedures are commercially reasonable.[3] (PSUF 115.)  Nor did the Bank employ routine security procedures such as personal identification numbers or PIN codes to ensure that no unauthorized person had transmitted messages to the Bank.[4] (PSUF 116.) Despite the alarming and significant departure from Plaintiff's typical payments, as admitted by the Bank's expert, the Bank had no protocol to assess the risk presented and to investigate the authenticity of the payment order to confirm verification. (PSUF 116.) And the Bank's bare bones security procedures failed to include security measures "not uncommon" in the industry. *Patco*, 684 F.3d  at 212.

Further, the Bank's characterization of the dual signature requirement as a form of multi-factor authentication is in error.  The three fraudulent wires demonstrate that a single threat actor was able to process the transactions and commit the fraud. Industry guidance recommends multi-factor authentication for online transactions in the era of frequent business email compromises and related fraud, as single-factor authentication has shown to be inadequate against such threats.[5] Moreover, while Ms. Tong claims she did a call back in connection with the $5,090,133.49 January 17, 2020 wire transfer (which if performed properly may have constituted multi-factor

---

[3] According to the FFIEC, multi-factor identification is defined by the National Institute of Standards and Technology ("NIST") as "[a]n authentication system that requires more than one distinct authentication factor for successful authentication. Multi-factor can be performed using a multi-factor authenticator or by a combination of authenticators that provide different factors. The three authentication factors are something you know, something you have, and something you are." NIST SP 800-63-3, Appendix A –Definition of "Multi-factor Authentication."

[4] *See* West's Cal. Code Forms, Com. Division 11 Introduction (3rd ed.)

[5] *See* Federal Financial Institutions Examination Council, "Authentication and Access to Financial Services and Systems", Section 5. Multi-Factor Authentication as Part of Layered Security, pp. 5-6 ("[U]se of single-factor authentication as the only control mechanism has shown to be inadequate against [customer account fraud] threats. Furthermore, single-factor authentication with layered security has shown to be inadequate for customers engaged in high-risk transactions and for high-risk users. ").

authentication), Ms. Tong and Plaintiff's Finance Manager Bob Beeson have differing recollections of the substance of that call: Ms. Tong stated she was doing a callback to confirm the details of the wire, while Mr. Beeson said she was calling to advise that due to the holiday, the wire would not go out until the following Tuesday.  (PSUF 89-96.)  Even under Ms. Tong's version, she failed to confirm the key data points that Defendant's expert states are required for a proper callback—i.e., the  amount of the purported wire and the name and location of the recipient bank.  (PSUF 92, 94.)  The Bank's wholesale failure to properly utilize multi-factor authentication in connection with Plaintiff's account enabled the threat actor to achieve the fraud.  If a bank accepts an unauthorized payment order without verifying it in compliance with a security procedure, the loss falls on the bank. *See* Cal. Com. Code, §§ 11202, 11203.

The Bank insists that *Choice Escrow* supports its position that the "dual control system" it employed was (i.e., the dual signatures) is commercially reasonable.  But the security procedures in *Choice* offered far greater safeguards than those offered by the Bank.  For example, in addition to "dual control system," security procedures included "a device authentication software called PassMark" which recorded the IP address of the customer's computer, thus verifying that each bank customer user was accessing the system from a recognized computer. *Id.* at 614.  If a user attempted to access the system from an unrecognized computer, the user would be prompted to answer "challenge questions" to verify the user's identity. *Id.*

Similarly, the cases cited by the Bank as "particularly instructive here", *Fed. Ins. Co. v. Benchmark Bank*, 2020 U.S. Dist. LEXIS 23315 (S.D. Ohio Feb. 11, 2020) and *All Am. Siding & Windows, Inc. v. Bank of Am., Nat'l Ass'n*, 367 S.W.3d 490 (Tex. App. 2012) involve security procedures with multifactor identification in addition to dual authorization systems.  The court in *Fed. Ins. Co.* emphasized that the bank had layered security in utilizing unique usernames and passwords, security challenge questions triggered by a risk algorithm, account lockout after three

**PLAINTIFF'S OPPOSITION TO DEFENDANT CMB WING LUNG BANK LTD.'S**
**NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**

66037720;1

AKERMAN LLP
601 W. FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

unsuccessful login attempts, and IP blacklisting in addition to its dual control system. *Id.* at *2. Likewise, in *All Am. Siding.*, all transactions were to be verified using an ID, passcode, and digital certificate verification. 367 S.W.3d at 490, 500-501.[6] The common thread in all of these cases is the courts' adherence to the significance of multi-factor authentication, as recommended by FFIEC guidelines, in analyzing a bank's security procedures for commercial reasonableness. Here, the Bank did not practice multi-factor authentication in its financial transactions for Plaintiff and its security procedures are not commercially reasonable under applicable legal precedent.

### 3. The Security Procedures Were Not Followed in Good Faith.

Even if commercially reasonable, the receiving bank must prove that it processed the payment order in good faith under Section 11202(b) of the CCC. "Good faith" is defined as "honesty in fact and the observance of reasonable commercial standards of fair dealing." UCC §§ 4A-105(d); 1-201(20). *Experi-Metal, Inc. v. Comerica Bank,* Case No. 09-14890, 2011 WL 2433383 (E.D. Mich. June 13, 2011) provides helpful guidance. There, the bank customer fell victim to a phishing email and 93 fraudulent wires totaling $1.9 million were executed. *Id.* at *14. The court found that a bank dealing fairly with the customer "would have detected and/or stopped the fraudulent wire activity earlier" based on the overseas destination of the funds and that the wire activity varied from the prior wire activity. *Id.* .

Similar to *Experi-Metal, Inc.*, this case involves a customer who fell victim to a hacker where the Bank ignored red flags and failed to act in good faith and employ reasonable commercial standards of fair dealing in processing the fraudulent wires. As detailed above, the fraudulent wire transmissions here were previously repetitive wires consistently sent to domestic beneficiaries, which entities were wholly

---

[6] The other cases cited by the Bank, *Filho v. Interaudi Bank v. Regatos v. N. Fork Bank*, 257 F. Supp. 2d 632, 646 (S.D.N.Y. 2003) and *Filho v. Interaudi Bank*, No. 03 Civ. 4795(SAS), 2008 WL 1752693, at *4 - 5 (S.D.N.Y. Apr. 16, 2008), also focus on the importance of implementing multifactor authentication.

AKERMAN LLP

601 W. FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

consistent with the stated reason for the transaction (*i.e.*, payment to a general contractor to a construction company).  Indeed, the Bank admitted that it was  aware of the regularity of Plaintiff's payment to Turner Construction and that the remittance application were typically handwritten. (PSUF 66, 68.) The fraudulent transactions at issue were abruptly changed from normally handwritten applications to cut and pasted signatures authorizing the wiring of funds for insurance payments and general contractor payments to a trading company in China as beneficiary.  Not only is Hong Kong commonly known as a high-risk source of phishing emails, but the stated reason for the change—an "IRS problem"—is also a red flag that would have triggered investigation for most banks, particularly here where the Bank was in the process of evaluating a $150 million construction loan to Plaintiff.  (PSUF 82.) Further, there was a discrepancy in the spelling of the email addresses of 800 Columbia representatives (PSUF 82, 85, 87), and a suspicious urgency in Bob Beeson's emails (sent by the hacker) wanting to know if the wires had been sent (PSUF 100), which emails were sent right after a telephone call between Shasha Tong and the real Bob Beeson where it was indisputably discussed that the wire would not be sent until after the holiday weekend.  (PSUF  42, 95.) Despite these atypical circumstances which should have triggered a more extensive review of the transactions, the Bank did not exercise *any* due diligence in investigating these red flags to evaluate the authenticity of the payment orders. (PSUF 101, 102, 106.)  The bank's own expert confirmed that the Bank did not "examine any available facts, including background and possible purpose of transaction, with respect to any of the three wire transfers at issue here." (PSUF 101.)  And all of the Bank employees who processed the three wire transfers testified at depositions that it was not their responsibility to investigate red flags or monitor Plaintiff's account for fraud.  (PSUF 108, 109.)

The Bank improperly argues that the only inquiry is what it "actually knew."  Yet, under the CCC, good faith has both a subjective component (honesty in fact) and

AKERMAN LLP

601 W. FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

**PLAINTIFF'S OPPOSITION TO DEFENDANT CMB WING LUNG BANK LTD.'S
NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**

AKERMAN LLP

601 W. FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

an objective component (observance of reasonable commercial standards of fair dealing)." *Mechanics Bank v. Methven*, No. A136403, 2014 WL 4479741, at *12 (Cal. Ct. App. Sept. 12, 2014).   The subjective prong concerns more than what the Bank "actually knew," but also whether the Bank complied with the agreed-upon security procedure. *See Chelan Cnty., Wash. v. Bank of Am. Corp*., No. 2:14-CV-0044-TOR, 2015 WL 4129937, at *13 (E.D. Wash. July 9, 2015).   Here, the Bank did not even follow what it claims was its call back procedure: that "[t]he parties agreed that all transfers equal to or above $1,000,000 would further be subject to telephonic call confirmation with Dong Liang" and "if Dong Liang was not in the United States, Wing Lung Bank could confirm the wire instructions with Robert Beeson."   (DSUF 28, PSUF 61.)   Yet phone records and witness testimony reveal that the Bank had *never* conducted a callback procedure to confirm wire instructions for transfers over $1,000,000. (PSUF 67.)   Moreover, testimony demonstrates that when the Bank called Plaintiff regarding the fraudulent wire meant for Turner Construction, the Bank did not discuss the change of beneficiary or amount of the payment, only that the payment would be made after the holiday weekend. (PSUF 95, citing to Beeson testimony: "The WITNESS: She called and was telling me that she wasn't going to be able to send the wire.   And I knew the bank holiday and the wire system was down, so it wasn't any earth-shaking news . . . Q. Okay.   Did – on that call, did you discuss the beneficiary of the wire transfer request that was going to be paid on January 21, 2020. A: No.   We had confirmed the payment information earlier that morning.").[7]

---

[7] Beeson clarified his mistaken statement that "[w]e had confirmed the payment information earlier that morning"—the mistaken statement is clearly in conflict with the call log on January 17, 2020. *See* Beeson Deposition at 153:23 – 154:6 ("Q. Okay. Now, you previously testified regarding the two calls you say you received from Ms. Tong on January 17, 2020.   A. Yeah, I must have been confused, because there was only one call.   And the first part of the – the gist of the first part is fine, about it not going out, but it's incorrect about – well, the part about it being a holiday is correct, but the part about Guoy is not correct."); *Id.* at 156:11 – 23 (Q. Okay. But you agree with me, though, that there's initiation of a remittance application on January 17, 2020.   And that's why Ms. Tong called you regarding the remittance application; right? To confirm that it should be paid on January 21, the following Tuesday, after

AKERMAN LLP

601 W. FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

What is more, the Bank was undeniably aware that Plaintiff regularly made general contractor payments to Turner Construction.  In fact, the Bank created and recommended to Plaintiff that it use a form remittance application for its wires to Turner Construction to make it easier. (PSUF 66, 68.)  Yet when this form remittance application for routine payments to the general contractor at a domestic bank was abruptly changed to a Chinese trading company with a bank in Hong Kong, the Bank consciously disregarded the glaring red flag.  *See In re Nelson,* No. 04-70024-FRA7, 2007 WL 2915407, at *2 (Bankr. D. Or. Sept. 28, 2007) (denying summary judgment where "at least an issue of material fact as to whether Wells Fargo buried its head in the sand regarding the bona fides of the underlying transfer and loan").

Second, the objective prong concerns whether the Bank accepted the payment order in accordance with the security procedures "in a way that reflects the parties' reasonable expectations as to how those procedures will operate." *See Mechanics Bank v. Methven*, No. A136403, 2014 WL 4479741, at *12 (Cal. Ct. App. Sept. 12, 2014).   Plaintiff expected the Bank to fulfill its representations in the Account Disclosure – *i.e.,* that the Bank would follow standards set forth in applicable anti-money laundering laws and federal regulations, including the Bank Secrecy Act, as amended by the U.S. Patriot Act. (PSUF 118.)   Further, based on the Bank's representations, Plaintiff's reasonable expectation was that the Bank required supporting documentation for international wires to explain the relationship between the Plaintiff and the recipient of the payment (PSUF 119.) The Bank's failure to require additional information or make any inquiry whatsoever regarding the unexpected change of beneficiary for a foreign wire transfer did not comport with Plaintiff's reasonable expectations.  In light of the multiple red flags and lack of evidence to support either the subjective or objective prongs, the Bank has not met its

the federal holiday on Monday?  THE WITNESS: . . . It was to advise me that the bank wasn't going to be able to send the wire on Martin Luther King Day.").

burden to show that it processed the fraudulent payment orders in good faith.  At the very least, there is a question of fact summary judgment should not be granted.  *See Mechanics Bank*, 2014 WL 4479741, at *12; *Peak–Las Positas Partners v. Bollag* 172 Cal. App. 4th 101, 106 (Cal. Ct. App. 2009) (good faith and objective reasonableness under contract are questions of fact).

### C.    Plaintiff's Common Law Claims are Actionable.

#### 1.    The CCC Does Not Preempt Common Law Causes of Action.

Unlike *Zengen, Inc. v. Comerica Bank*, 41 Cal. 4th 239 (Cal. 2007) where the common law claims were based on the bank's acceptance of the fraudulent payment orders, Plaintiff's allegations of fraud and negligence here focus on conduct prior to and outside of the wire transfer process, specifically the Bank's misrepresentations of its security procedures and its failure to implement policies and procedures to safeguard Plaintiff's funds or adequately train and supervise its employees. *Id. at* 254 (UCC does not displace common law actions based on activities surrounding funds transfers); *see also Barrett v. JP Morgan Chase Bank,* No. 14-CV-2976-DMS WVG, 2015 WL 631652, at *3–4 n.3 (S.D. Cal. Feb. 13, 2015) (UCC does not preempt claims based on misconduct outside wire transfer); *Across Am. Ins. Servs., Inc. v. Bank of Am., N.A.*, No. SACV180874 DOCPLAX, 2018 WL 5906674, at *4 (C.D. Cal. Sept. 24, 2018) (UCC does not displace negligence claim based on breach arising before fraudulent wire); *Venture Gen. Agency, LLC v. Wells Fargo Bank N.A.,* 19-cv-02778-TSH, 2019 WL 3503109, at *4 (N.D. Cal. Aug. 1, 2019) (claims based on actions subsequent to wire transfers not preempted).

##### a.    Plaintiff's Fraud Causes of Action are Not Preempted.

The gravamen of Plaintiff's fraud claims is the misrepresentation made by the Bank regarding its security procedures—not whether Defendant followed agreed security procedures in transmitting the fraudulent wires or the adequacy of such procedures.  Indeed, despite the Bank's representations that it required documentation

AKERMAN LLP
601 W. FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

66037720;1

of a business relationship before wiring funds to off-shore accounts, the Bank had no intention of following those procedures. Even faced with an apparent scheme to evade U.S. "tax issues" by transferring millions of dollars to an off-shore account in a high-risk country, Ms. Tong did not request any additional explanations or documentation. (PSUF 77, 81, 85, 102, 105.) Thus, the Bank's misrepresentations are sufficiently distinct from its processing of the unauthorized payment orders such that the fraud claims are not preempted by the CCC. *See Valley Bank of Ronan v. Hughes*, 147 P.3d 185, 191 (Mont. 2006) (claims arising from bank's misrepresentations about check settlement process were not preempted by UCC); *S&S Worldwide, Inc. v. Wells Fargo Bank*, 509 F. Supp. 3d 1154, 1162 (N.D. Cal. 2020) (claims based on bank allowing scammer to open account and transfer funds not preempted).[8]

### b. Plaintiff's Negligence Claim is Not Displaced.

The gravamen of Plaintiff's negligence claim is that the Bank breached the duty of care it owed Plaintiff by failing to implement procedures to safeguard funds Plaintiff entrusted to it and failing to adequately train and/or supervise its employees. (ECF 18 at 103; PSUF 107-109.) Defendant also negligently aided the fraudster by convincing Plaintiff to use a typed, pre-filled wire transfer authorization which was less secure than handwritten forms. (PSUF 67, 68.) Even where the conduct relates to a transaction covered by the CCC, if the conduct supporting the negligence claim predates or is otherwise outside the scope of the CCC violation, the CCC does not displace common law. *See Across Am. Ins. Servs.,* ACV180874 DOCPLAX, 2018 WL 5906674, at *4 (C.D. Cal. Sept. 24, 2018); *Prime Health Servs., Inc. v. Cap. Bank, N.A.,* No. 3:16-CV-00034, 2017 WL 1064360, at *2-4 (M.D. Tenn. Mar. 21, 2017) (denying motion to

---

[8] The Bank's misrepresentations regarding its security policies constitute a promise regarding a material fact without any intention of performance, and with an intent to deceive Plaintiff to maintain its account. Plaintiff reasonably relied on the Bank's misrepresentations to its detriment, resulting in damage to Plaintiff. Thus, Plaintiff has sufficiently demonstrated promissory fraud and intentional/negligent misrepresentation. *Cal. Surgical Inst., Inc. v. Aetna Life & Cas. Berm. Ltd.*, 2020 U.S. Dist. LEXIS 245755, at *25-26 (C.D. Cal. Oct. 20, 2020),

AKERMAN LLP
601 W. FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

66037720;1

dismiss claims against bank based on employees negligence in violating internal policies).

The cases cited by Defendant are distinguishable because all of them involve dismissal of negligence claims involving the fraudulent payment (which is covered by the CCC)—not defendants' negligent conduct *outside of* the unauthorized funds transfers. *See Lundgren v. Bank of Am., N.A.*, 2011 U.S. Dist. LEXIS 114334 at *17 (N.D. Cal. Oct. 4, 2011) (dismissed negligence claim based on payment of fraudulent checks, but refusing to dismiss claim against Bank for negligently depositing the fraudulent checks in the fraudster's account); *see also Joffe v. United Cal. Bank*, 141 Cal. App. 3d 541, 557 (1983) (dismissed claim based on wrongful payment of fraudulent check); *ReAmerica, S.A. v. Wells Fargo Bank Int'l*, 2008 U.S. Dist. LEXIS 30614 at *21 (S.D.N.Y. Mar. 18, 2008) and *McClellon v. Bank of Am., N.A.*, 2018 U.S. Dist. LEXIS 172700, at *11 (W.D. Wash. Oct. 5, 2018) (dismissing negligence claims based on unauthorized funds transfers). Plaintiff's negligence claim is based on the Bank's negligent supervision and training and failure to implement procedures to safeguard Plaintiff's funds—not on the unauthorized transfers themselves.

### i. The Economic Loss Rule Does Not Apply.

Defendant argues that Plaintiff's negligence claims are "barred by California's economic loss rule". MSJ at 16. But all of the cases cited by Defendant deal with tort claims that are ancillary to and accompanying breach of contract claims or otherwise specifically address an alleged "special relationship" with a bank. To be clear, Plaintiff's claims of negligence do not arise from nor are they related to a breach of contract claim; rather, Plaintiff's negligence claims arise from Defendant's breach of the ordinary and reasonable duty of care owed by banks to their customers. Furthermore, the economic loss rule does not bar Plaintiff's fraud and intentional misrepresentation claims. *See Sheen v. Wells Fargo Bank, N.A.,* 505 P.3d 625, 647 (Cal. 2022)*, reh'g denied* (June 1, 2022)(allowing borrower to pursue various intentional tort

AKERMAN LLP
601 W. FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

theories, such as fraud and intentional misrepresentation); *Robinson Helicopter Co. v. Dana Corp.*, 102 P.3d 268, 274 (Cal. 2004) (holding that the economic loss rule does not bar fraud and intentional misrepresentation claims).

### D.    Plaintiff's Damages Should Not Be Reduced.

While Plaintiff has recovered approximately $990,000 U.S. dollars of the amount lost in Hong Kong litigation, recovery against Defendant for the full amount of losses is still warranted. The Supreme Court of California has long adhered to the doctrine that if an injured party receives compensation from a source independent of the tortfeasor, such payment should not be deducted from the damages which plaintiff would collect from the tortfeasor. *Helfend v. S. Cal. Rapid Transit Dist.*, 465 P.2d 61, 63 (Cal. 1970); *Smock v. State of California*, 138 Cal. App. 4th 883, 885 (Cal. Ct. App. 2006) (collateral source rule barred consideration of the amounts provided by employer following accident). Here, where the Plaintiff has expended considerable sums to recover for the injury incurred, "application of the [collateral source] rule is not considered to lead to a double recovery, but rather to a 'closer approximation to full compensation.'" *Id* at 887; *see also Helfend*, 2 Cal. 3d at 9-10 (applying collateral source rule to permit plaintiff to recover from the negligent transit company for medical expenses already paid for under plaintiff's medical insurance coverage).

### E.    The Bank Is Not Entitled to Summary Judgment on Mitigation.

Defendant argues Plaintiff had a duty to mitigate or that the doctrine of avoidable consequences applies here, but Defendant cites nothing to support that these doctrines apply to Plaintiff's claims.  In the case of fraud, plaintiff has no duty to mitigate until it actually discovered the damage. *See Home Indem. Co. v. Lane Powell Moss & Miller*, 43 F.3d 1322, 1329 (9th Cir. 1995).  Moreover, the CCC does not use the term "duty to mitigate;" rather, it makes clear that "[t]he burden of making available commercially reasonable security procedures is imposed on receiving banks." Cal. Com. Code §11203, Cmt. 3. In any case, the issue of Plaintiff's

**PLAINTIFF'S OPPOSITION TO DEFENDANT CMB WING LUNG BANK LTD.'S
NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**

AKERMAN LLP
601 W. FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

1    mitigation of damages is a "question of fact" for the jury. *Royal Thrift and Loan Co. v.*
2    *County Escrow*, Inc., 20 Cal. Rptr. 3d 37, 47 (Cal. Ct. App. 2004).

3    **V.    CONCLUSION**

4          Because at a minimum myriad factual issues remain, and because the Bank
5    cannot demonstrate it is entitled to judgment as a matter of law, summary judgment
6    should be denied.

7

8    Dated: August 26, 2022                         **AKERMAN LLP**

9

10                                                   By: */s/ Ellen S. Robbins*
11                                                        Ellen S. Robbins
12                                                        Alicia Y. Hou
13                                                        Jonathan M. Turner
                                                      Attorneys for Plaintiff 800 Columbia
14                                                    Project, LLC

**PLAINTIFF'S OPPOSITION TO DEFENDANT CMB WING LUNG BANK LTD.'S
NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**

66037720;1

**AKERMAN LLP**
601 W. FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342